UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

United States of America,

        Plaintiff,                         Civ. No. 11-62 (RHK/JJK)
                                                 **MEMORANDUM OPINION**
                                                 **AND ORDER**

v.

Jo Anna Bame, Hook 'N Horn Ltd.,
Hook 'N Horn Wilderness Camp, and
I Am Home, Inc.,

        Defendants.

---

Daniel A. Applegate, Michael J. Roessner, United States Department of Justice, Washington, D.C., for Plaintiff.

Adam S. Huhta, Huhta Law Firm, PLLC, Minneapolis, Minnesota, for Defendants.

---

## INTRODUCTION

This case arises from the confluence of a fourth marriage, an involuntary bankruptcy, a secret divorce and reconciliation, an erroneous tax refund deposited in a Canadian bank account, an unexpected death, and an Ontario fishing lodge. The IRS issued Fred Bame an erroneous refund of nearly $600,000 in 2005, which he deposited into a Canadian account controlled jointly by his wife, Defendant Jo Anna Bame. The money was quickly spent to cover Jo Anna's debts and those of two of her companies, Defendants I Am Home, Inc. ("I Am Home") and Hook 'n Horn Wilderness Camp ("Hook 'n Horn"). Efforts to collect the erroneous refund without litigation were unsuccessful, and the Government filed suit against Fred Bame in July 2007. He died a

few weeks later, and the Government eventually obtained a judgment against his estate. The Government was unsuccessful in collecting the judgment, and it brought the instant action against Jo Anna Bame in January 2011, asserting claims of fraudulent transfer, money had and received, and unjust enrichment. Presently before the Court are the parties' cross-Motions for Summary Judgment. For the reasons that follow, the Court will deny Defendants' Motion and grant the Government's Motion.

## BACKGROUND

### The Parties

Jo Anna Bame lives in Minneapolis, Minnesota. In 2000, she purchased Hook 'n Horn, a fishing camp on Rowan Lake near Nestor Falls, Ontario, Canada, from her husband, the late Fred Bame, pursuant to a settlement agreement with the trustee of Fred's involuntary bankruptcy estate. (Applegate Decl. Ex. 23; Bame Dep. at 147.) In 2008, Jo Anna sold the assets of Hook 'n Horn (which she ran as a sole proprietorship) to the newly incorporated Hook 'n Horn Wilderness Camp Ltd. ("HnH Ltd.") in exchange for HnH Ltd. shares and a promissory note. (Bame Decl. Ex. 1.) She continues to operate HnH Ltd. in much the same fashion as she did Hook 'n Horn. I Am Home is the corporate name on a checking account that Jo Anna uses for personal matters. (Bame Dep. at 71-73, 173-74.)

### The Bames' Marriage

In 1992, before Fred and Jo Anna married, they entered into an antenuptial agreement ("the Antenuptial"), which provided that Fred and Jo Anna would each "separately hold and control all rights in and to his or her own property, whether such

property is now owned or hereafter acquired . . . , free and clear of any and all claims by the other party." (Huhta Decl. Ex. 2.) In effect, what was his would stay his, and what was hers would stay hers. The couple married on March 25, 1992, and the following June, Jo Anna conveyed her property at 5110 Meadville Street, Excelsior, Minnesota to herself and Fred as joint tenants. (Applegate Decl. Ex. 13.)

Bankruptcy and Divorce

Over the next few years, Fred and Jo Anna took out several mortgages on the Excelsior property, ostensibly to support Fred's business ventures. Those ventures turned unprofitable, and an involuntary bankruptcy petition was filed against Fred in 1998. Just before the petition was filed, Fred transferred Hook 'n Horn (which Fred then owned) to Jo Anna for $1. During bankruptcy, Jo Anna filed a proof of claim with the bankruptcy trustee, asserting that Fred owed her $1,228,984. (Applegate Decl. Ex. 24.) The trustee commenced an adversary proceeding against her to set aside several pre-petition conveyances as fraudulent, and they settled that matter in March 2000. (Huhta Dep. Ex. 3.) As part of the settlement, Jo Anna withdrew her proof of claim, surrendered any and all claims against the trustee and Fred's bankruptcy estate, and purchased Hook 'n Horn for $250,000. (Id.)

During the bankruptcy, the Bames' relationship became severely strained, and in October 2001, they filed a petition for divorce. (See Applegate Decl. Ex. 38.) The petition listed Fred's address as a used car dealership in Itasca County, although it is unclear whether he ever resided there. (Montavon Decl. ¶¶ 3 & 4.) In the divorce decree, the couple agreed that Fred would be responsible for $17,799.79 of marital debt, as well

as several tax liens on the Excelsior property. (Applegate Decl. Ex. 38.) Fred and Jo Anna each told only one person that they had divorced, and their children believed them to be still married. (Bame Dep. at 41-43.) In January 2002, only a few months after filing the divorce petition, they filed for Social Security benefits and listed themselves as married. (Applegate Decl. Ex. 40.) They maintained a relationship and in 2003 were living together again. Fred's September 2007 obituary named Jo Anna as his wife. (Id. Ex. 34.) Jo Anna acknowledges that she authored the obituary, but insists that one of Fred's children edited it to name her as his wife. (Bame Dep. at 51-52.) When the Government sent requests for admission about Jo Anna's Social Security benefits, she responded to the Social Security Administration that she had lied about being married because she did not think it would find out about the divorce. (Applegate Decl. Ex. 42.)

### The Erroneous Refund

Fred's bankruptcy estate generated income during the bankruptcy, and the trustee agreed that the estate would pay approximately $580,000 to the IRS to satisfy its tax obligations. The IRS received the payment on January 2, 2003, but it did not immediately assess the tax against the estate. As a result, the estate had a credit balance of about $580,000 with the IRS for more than two years following the January 2003 payment.

In May 2005, before the IRS assessed the tax and for unknown reasons, the bankruptcy estate's credit balance was transferred to Fred's personal tax account for tax year 1998; this resulted in an apparent overpayment of his 1998 taxes. The IRS sent Fred notice that he would be receiving a refund of $519,360.31 plus interest for his individual

4

1998 taxes. (Applegate Decl. Ex. 3.) Fred twice contacted the IRS to confirm that he would be receiving the refund—once on June 13, 2005, and again on July 12, 2005. (Id. Ex. 48.) Both times the IRS confirmed that its records showed that a refund was forthcoming. Fred received a July 19, 2005 letter from Kathy Wells of the Taxpayer Advocate Service, a division of the IRS, indicating that the refund would be sent to him. After deducting $11,000 for individual taxes he owed from 1998, the IRS issued Fred a refund check of $568,022.13 on Friday July 29, 2005. (Id. Ex. 50.)

When the check was received by the Bames, Fred and Jo Anna immediately drove to Nestor Falls, Ontario, and on Wednesday, August 3, they deposited it into a joint account at Lakewood Credit Union in Nester Falls, Ontario. (Id. Ex. 50-51.) Over the next few days, they wrote several checks from that account, including: $95,000 to National City as payment to a mortgage on Jo Anna's property at 836 Thornton, Minneapolis, Minnesota; $70,000 to Wells Fargo as payment to a mortgage on Jo Anna's property at 300 Ranchview, Wayzata, Minnesota; $185,000 to the I Am Home account at Central Bank; and $100,000 to Hook 'n Horn, via check deposited into the Hook 'n Horn account Jo Anna controlled. (Id. Ex. 55.) The checks to Hook 'n Horn and I Am Home cleared on August 11. On August 12, Hook 'n Horn paid $11,949.20 for boat motors. By August 15, Jo Anna had written checks totaling $162,468.31 from the I Am Home account. The Lakewood Credit Union account balance on October 6, 2005, was $4,731.52. (Id.)

The Present Litigation

At some later time, the Government determined that the refund check had been issued by mistake. Its efforts to contact Fred and Jo Anna were unsuccessful, and on August 30, 2006, a notice that the IRS would levy Fred's Social Security benefits was sent to his last known address at 836 Thornton. The letter was sent back marked "return to sender." (Applegate Decl. Ex. 58.) Jo Anna testified in her deposition that she and Fred saw no reason to respond to the Government's collection efforts because "the money was gone." (Bame Dep. at 199.) After its collection efforts failed, the Government brought suit against Fred in this Court to recover the erroneous refund. (See United States v. Estate of Fred H. Bame, Civ. No. 07-3527 (PAM/JSM).) Fred died a short time later, and his estate was substituted as a defendant. The estate then stipulated to the entry of judgment for the full amount sought by the Government. (See Doc. Nos. 11-12, Civ. No. 07-3527 (PAM/JSM).)

The Government then commenced the instant action to recover the erroneous refund described above under the Federal Debt Collection Procedures Act, 28 U.S.C. §§ 3301 *et seq.*, the Minnesota Uniform Fraudulent Transfer Act, Minn. Stat. § 513.44(a)(1), money had and received, and unjust enrichment. After undertaking discovery, the parties now cross-move for summary judgment. The issues have been fully briefed, the Court heard oral argument on June 29, 2012, and the Motions are now ripe for disposition.

6

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078-79 (8th Cir. 2008).

Where, as here, the Court confronts cross-motions for summary judgment, this approach is only slightly modified. When considering the Government's Motion, the Court views the record in the light most favorable to Defendants, and when considering Defendants' Motion, the Court views the record in the light most favorable to the Government. "Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact." Seaworth v. Messerli, Civ. No. 09-3437, 2010 WL 3613821, at *3 (D. Minn. Sept. 7, 2010) (Kyle, J.), aff'd, 414 Fed. App'x 882 (8th Cir. 2011).

**ANALYSIS**

**I.      Liability**

The Government's statutory claims raise several issues concerning statutes of limitation, insider status, the effect of the Bames' antenuptial agreement, possible estoppel, and more that the Court need not address. Even if Defendants' arguments were to prevail, equity dictates that they return the erroneously distributed funds under the doctrine of unjust enrichment. In Minnesota, an unjust-enrichment claim requires a plaintiff to show that the defendant (1) has knowingly received a benefit (2) to which he is not entitled (3) in circumstances under which retaining the benefit would be unjust. Southtown Plumbing, Inc. v. Har-Ned Lumber Co., Inc., 493 N.W.2d 137, 140 (Minn. Ct. App. 1992) (citing In re Stevenson Assocs., Inc., 777 F.2d 415, 421 (8th Cir. 1985)). "The theory unjust enrichment is based on what the person allegedly enriched has received, not on what the opposing party has lost." Georgopolis v. George, 54 N.W.2d 137, 143 (Minn. 1952).

Jo Anna argues that Fred transferred the refund to her in satisfaction of debts that he owed under the divorce decree. When a defendant "is enriched by what he is entitled to under a contract or otherwise," unjust enrichment provides no recovery. Schaaf v. Residential Funding Corp., 517 F.3d 544, 554 (8th Cir. 2008) (quotation and citation omitted). On its face, however, the only debts listed on the divorce decree are $17,799.79 in marital debt and various tax liens. (Applegate Decl. Ex. 38.) Jo Anna has produced no evidence that she paid the listed marital debt and thereby obligated Fred to reimburse her. With respect to the tax liens, Jo Anna's settlement with the bankruptcy trustee "fully,

completely, and finally settle[d], compromise[d] and dispose[d] of any and all controversies and claims" between Jo Anna and the estate.  Because all of Fred's legal and equitable interests were transferred to the bankruptcy estate when the petition was filed, see United States *ex rel.* Gebert v. Transp. Admin. Servs., 260 F.3d 909, 913 (8th Cir. 2001), Jo Anna irrevocably withdrew all claims against Fred's estate as part of the settlement, and she retained no power to collect on any debts that accrued before January 27, 2000.  The argument that Fred used the erroneous tax return to pay a pre-existing debt that arose from the divorce decree simply has no support in the record.  Accordingly, the Court determines that Fred's deposit into the joint account was not to satisfy a pre-existing contractual obligation to Jo Anna.

Defendants also argue that they were not unjustly enriched because Jo Anna did not know that the refund was erroneous.  If she did not know and had no reason to know that she was receiving money by mistake, then the Government's equitable claim fails.

Jo Anna does not argue that Fred was in fact entitled to the refund.  Instead, she argues that she reasonably relied on the IRS's assurances that the refund was appropriate.  As a matter of law, however, Jo Anna cannot rely on the mistaken advice of an IRS agent.  United States v. MacPhail, 149 F. App'x 449, 454 (6th Cir. 2005) ("[W]e have been very clear in the past that a mistake of law by a Government agent, acting without audit or examination, does not amount to an act or interpretation upon which [the taxpayer] could justifiably rely."); see also Heckler v. Cmty. Health Servs., 467 U.S. 51, 63 (1984) ("[T]hose who deal with the government are expected to know the law and may not rely on the conduct of government agents contrary to the law.").  Here, Jo Anna

9

argues that she reasonably relied on IRS information that Fred was legally entitled to the refund, while at the same time conceding that he was not.  Accordingly, Jo Anna cannot rely on any advice the IRS gave Fred regarding whether he was entitled to the refund.

      Moreover, based on the information available to her, Jo Anna reasonably should have known that Fred was not entitled to the refund, and her subsequent conduct shows that she did.  She knew that Fred had undergone a bankruptcy in 1998, the same year for which the IRS informed him that he would be receiving a refund.  When the check arrived, the couple wasted no time and immediately drove to Canada and deposited the refund check in a Canadian bank.  Most of the money was gone within a matter of days.  Jo Anna and Fred avoided the IRS when it began to seek recovery of the erroneous refund and marked letters the Government sent to Fred "return to sender."  Importantly, Jo Anna did not report any of the proceeds she received from the refund on her 2005 tax return.  See MacPhail, 149 F. App'x at 454 ("[T]he fact that [Defendant] did not report the 1996 overpayment on his 1997 return indicates rather forcefully that he had no expectation that any of that money was his.").  Looking at her conduct immediately after receiving the erroneous refund check combined with the fact that she could not reasonably rely on the IRS agents' advice, there is no genuine issue Jo Anna knew that Fred was not legally entitled to the refund.  Her good-faith defense fails.

**II.**    **Damages**

      What remains for the Court is to determine Defendants' liability.  The amount the Government is able to recover from Jo Anna, I Am Home, and HnH Ltd. "is based on what the person allegedly enriched has received, not on what the opposing party has

lost." Georgopolis, 54 N.W.2d at 142. The record shows that Fred withdrew $42,000 from the Lakewood Credit Union account (Huhta Decl. Ex. 9), and there is no evidence to indicate that Jo Anna received a benefit of those funds.

The balance of the funds, however, went to benefit either Jo Anna directly or one of her corporations. The funds paid to Wells Fargo ($70,000) and National City ($95,000), both to pay mortgages on property Jo Anna owned, are a benefit to which she was plainly not entitled and that it would be unjust to allow her to retain. The Government also asserts, and Jo Anna does not contest, that I Am Home is an incorporated entity that she uses to conduct her personal business. It does not observe any corporate formalities, keeps no corporate records, and is simply a façade for Jo Anna's individual dealings. Shortly after Fred deposited the erroneous refund check, I Am Home received $185,000 from the joint account. As such, Jo Anna is also liable for the $185,000 deposited in the I Am Home account.

The Government further argues that HnH Ltd. is Jo Anna's alter ego and, therefore, it should be allowed to recover the erroneously issued refund from HnH Ltd. See United States v. Sherping, 187 F.3d 796, 801 (8th Cir. 1999) (holding that the government may recover debts from a defendant's alter ego). When discerning whether an entity is one's alter ego,

> [f]irst, the court considers the relationship between the individual and the entity, focusing on factors including the failure to observe corporate formalities, siphoning of funds by the individual, the nonfunctioning of other officers and directors, the absence of corporate records, and the existence of the corporation as merely a façade for individual dealings. Second, the court examines the relationship between the entity and the party seeking to disregard the entity. Satisfaction of this prong requires the

11

> showing of an element of injustice or fundamental unfairness, which can be made through evidence that the entity has been operated as a constructive fraud or in an unjust manner.

United States v. Bigalk, 654 F. Supp. 2d 983, 994 (D. Minn. 2009) (Ericksen, J.) (internal citations and quotation marks omitted).

Jo Anna asserts that HnH Ltd. operates as a separate entity, keeps appropriate records, and avoids comingling funds.  The Court disagrees.  Jo Anna is the sole shareholder and continues to run the business the same as she did when it was a sole proprietorship.  When HnH Ltd. acquired Hook 'n Horn, nothing changed.  The HnH Ltd. bank account remains under her exclusive control.  Jo Anna still runs the camp as she did before it was incorporated, and she retains control of the camp's assets.  Indeed, she has used a bank account under the name "Hook 'n Horn Ltd." to run the camp since 2005, three years *before* HnH Ltd. was incorporated.  Taking the above into consideration, the Court determines that the Government satisfies the first prong of the alter-ego test with respect to HnH Ltd.

To satisfy the second prong, the Government argues that HnH Ltd. has been used as a constructive fraud to avoid Fred and Jo Anna's creditors.  Indeed, Fred transferred the camp to Jo Anna just before the 1998 bankruptcy was filed against him, a transaction that the trustee moved to set aside as fraudulent.  (See Applegate Decl. Ex. 20.)  After the Government issued the erroneous refund in 2005, Fred deposited the funds into a joint account and Jo Anna received the funds as Hook 'n Horn.  She incorporated the camp only after the Government instituted a collection action against Fred in 2007.  It would be fundamentally unfair to allow the corporate form of HnH Ltd., which operates in much

the same manner as when it received the erroneously issued Government funds, to prevent the Government from collecting those funds to which it has a superior claim. Accordingly, the Court determines that HnH Ltd. is an alter-ego of Jo Anna Bame. Altogether, Defendants have been unjustly enriched to the amount of $526,022.13 as a result of the erroneous refund.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 60) is **DENIED** and the Government's Motion for Summary Judgment (Doc. No. 66) is **GRANTED**. The Government shall recover of Defendant Jo Anna Bame the sum of $526,022.13. Of this amount, she and HnH Ltd. are jointly and severally liable for $100,000, and she and I Am Home are jointly and severally liable for $185,000.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Date: August 16, 2012                           s/Richard H. Kyle
                                                RICHARD H. KYLE
                                                United States District Judge